UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL L. HANSON,

      **Plaintiff,**

  v.                                Case No. 14-CV-750

HOLLY MEIER, et al.,

      **Defendants.**

## DECISION AND ORDER

Plaintiff Daniel L. Hanson, who is representing himself, is currently incarcerated at Prairie du Chien Correctional Institution. He filed this lawsuit pursuant to 42 U.S.C. § 1983 and was granted leave to proceed <u>in</u> <u>forma</u> <u>pauperis</u> on his claims that defendants were deliberately indifferent to his foot pain in violation of the Eighth Amendment to the U.S. Constitution. On January 20, 2016, defendants filed a motion for summary judgment,[1] which is now fully briefed. In his response to defendants' motion, plaintiff also requested to amend his complaint to include new defendants based on information he learned only after receiving defendants' motion. For the reasons stated below, I grant defendants' motion and dismiss this case.

---

[1] In his response to defendants' motion for summary judgment, plaintiff mentions in a parenthetical that he "now cross-move[s] for summary judgment." (Docket #59 at 13.) The deadline for filing motions for summary judgment was January 20, 2016; plaintiff filed his "cross-motion" after the deadline on February 5, 2016. In addition, the "cross-motion" fails to comply with the requirements set forth in Civil Local Rule 56. I will deny his "cross-motion" and consider his filing only as a response to defendants' motion.

## I. Facts[2]

### A. Parties and Claims

Plaintiff is a Wisconsin Department of Corrections ("DOC") inmate who was confined at Fox Lake Correctional Institution during the time relevant to his claims. (Docket #45 ¶1.) Defendants are current or former employees of the DOC: Holly Meier is a Nursing Supervisor (also known as a Health Services Unit Manager) at Fox Lake (Docket #45 ¶2); Jody DeRosa was the Bureau of Health Services Nursing Coordinator at Fox Lake (Docket #45 ¶5); Scott Hoftiezer is a physician at Dodge Correctional Institution and holds the position of Associate Medical Director of the Bureau of Health Services (Docket #45 ¶10); and Randall Hepp is the Warden at Fox Lake (Docket #45 ¶12).

Plaintiff claims that defendants violated the Eighth Amendment by refusing to refer him to a podiatrist despite the allegedly debilitating pain in his feet.

### B. Medical Requests at Fox Lake

Generally, if an inmate requires non-emergency medical attention, he must submit a Health Services Request Form ("HSR") to the Health Services Unit (Health Services). (Docket #45 ¶19.) Nursing staff triage the HSRs daily and schedule inmates to go to sick call, as needed. (Docket #45 ¶20.) Sick call is held every weekday. (Docket #45 ¶20.) Meier, the Nursing Supervisor, does not review every response sent to inmates by Health Services staff. (Docket #45 ¶21.)

---

[2] Facts are taken from Defendants' Proposed Findings of Fact, Plaintiff's sworn response to defendants' motion for summary judgment, and plaintiff's sworn complaint, which the Seventh Circuit has instructed district courts to construe as an affidavit at the summary judgment stage. Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996).

2

Case 2:14-cv-00750-LA   Filed 02/29/16   Page 2 of 20   Document 62

When an inmate makes a "special needs request" for items not normally given to an inmate in the normal course of business, the Fox Lake Special Needs Committee reviews the special needs request to determine whether the requested item is medically necessary. (Docket #45 ¶¶23-24.)

**C. Hanson's HSR Requests Answered by Meier**

Plaintiff submitted numerous HSRs in connection with his foot pain (in addition to many other ailments). On March 16, 2011, he requested flat-soled shoes. (Docket #45 ¶25; Docket #1-1 at 23, 24.) That same day, Meier notified Hanson that he would be scheduled for a foot evaluation in Health Services. (Docket #45 ¶25; Docket #1-1 at 23.) In February 2012, plaintiff made a special needs request for Velcro soft-soled shoes; the Fox Lake Special Needs Committee approved this request on February 28, 2012 (they approved another new pair of Velcro shoes on April 12, 2013). (Docket #45 ¶¶26-27; 33.) On March 20, 2012, plaintiff requested gel inserts for his shoes. (Docket #45 ¶30.) Meier responded that his treating physician had not ordered foot orthotics and that Health Services did not have gel inserts. (Docket #45 ¶30-31.) She informed him that he could purchase gel inserts through the canteen. (Docket #45 ¶31.)

On April 9, 2012, plaintiff inquired about x-ray results. (Docket #1-1 at 30.) He asked, "How did the x-rays turn out on my two feet? The pain is still unbearable. 'Please' find out what the x-ray's [sic] revealed about my toe's [sic]." (Docket #1-1 at 30.) The radiology report for both feet indicated that, "The ossification is normal . . . , including the tarsal bones. There is mild degenerative joint disease seen. There is no fracture, dislocation, or soft tissue swelling. No osteomyelitis is seen." (Docket #1-1 at 28-29.)

3

On April 12, 2012, plaintiff requested that he be allowed "to be fitted with a wider shoe with flat sole bottom shoe so [his] toe's [sic] do not have to bend with every step because [t]he pain is too much." (Docket #1-1 at 31.) A non-defendant nurse referred the request to a supervisor.

On February 27, 2013, plaintiff requested an appointment with a doctor because of pain in his big toes. (Docket #45 ¶32.) Meier informed plaintiff that he would be seen on March 14, 2013, by a Health Services physician. (Docket #45 ¶32.)

On April 16, 2013, plaintiff submitted four HSRs in which he described an "on-going pain issue." (Docket #1-1 at 17, 18, 20, 21.) He asked to be fit for a "special shoe" and explained that both big toes were "bad with arthritis." (Docket #1-1 at 17.) He also said, "Both feet & big toe's [sic] pain [Cortisone] shot's [sic] not working." (Docket #1-1 at 18; Docket #49-1 at 12.)

On April 20, 2013, plaintiff submitted an HSR in which he stated, "The prison shoe is not helping my feet at all–they are making it worse. I can hardly walk anymore. 'The pain is excruciating'!" (Docket #1-1 at 16.) A non-defendant nurse responded about a week later, referring the complaint to an Health Services supervisor. (Docket #1-1 at 16.)

Hanson followed up on a special needs request on May 4, 2013, which Meier responded to that same day. (Docket #45 ¶34.) In that request he indicated he was having pain issues in both big toes and over-swelling of his joints. (Docket #1-1 at 15.) On June 6, 2013, Hanson requested different sized insoles because the one previously given to him were too small. (Docket #45 ¶35.) Meier responded on June 11, 2013, and informed him that the correct size was being ordered. (Docket #45 ¶35.)

4

In May 2014, Meier began an extended medical leave; she did not return to the institution until August 11, 2014. (Docket #45 ¶36.) During her leave she did not have access to inmate medical records, and she was not informed of any inmate complaints concerning Health Service. (Docket #45 ¶36.)

**E. Hanson's Class III Request**

On May 14, 2014, the plaintiff's treating physician at Fox Lake (not a defendant) submitted a Prior Authorization for Therapeutic Level of Care form, otherwise known as a Class III request, to the Bureau of Health Services Class III Utilization Review Committee (the "Committee"). (Docket #45 ¶37.) The treating physician, who was also a member of the Committee, asked the Committee to refer plaintiff to a podiatrist based on plaintiff's reported foot pain, his complaints about his treatment options at Fox Lake, and his request to see a podiatrist. (Docket #45 ¶37.) The treating physician noted in his request that plaintiff "states he is missing out on the benefits of regular walking because he can't tolerate the pain in his MTP joints. He states his shoes do not have enough support." (Docket #1-1 at 1.) The treating physician also noted that plaintiff's "gait was not guarded and he seems to bear weight well. Past x-ray findings have been consistent with osteoarthritis." (Docket #1-1 at 1.)

On May 14, 2014, the Committee consisted of the following medical providers: Dr. William Kelley, Dr. Burton Cox, Dr. Mary Suavey, Dr. Charles Larson (plaintiff's treating physician), Dr. Jeffrey Manlove, Dr. Meena Joseph, Nurse Practitioner Dmitriy Chester, and Nurse Practioner Nancy Garcia.[3] (Docket #45 ¶45.) Hofteizer chairs the Committee along

---

[3] None of the Committee members are currently defendants; however, in his response to defendants' motion for summary judgment, plaintiff seeks leave to amend his

5

with Dr. Kelly O'Brien. (Docket #45 ¶47.)

The Committee discussed the Class III request with the treating physician, who made a verbal presentation and answered questions from the Committee. (Docket #45 ¶48.) Hoftiezer recalls that plaintiff presented with bilateral degenerative arthritis of his big toes. (Docket #45 ¶49.) However, his toes lacked more concerning signs or symptoms such as inflammation, infection, or other disease processes that could threaten plaintiff's health. (Docket #45 ¶49.) Hoftiezer states that plaintiff's "feel" showed minimal to no dysfunction and plaintiff was able to carry out the acts of daily living. (Docket #45 ¶49.) The Committee unanimously decided not to refer plaintiff to a podiatrist because plaintiff had a fairly normal physical exam and was functional and there was no medical need for orthotics. (Docket #45 ¶53.) Defendants state that the cost of the treatment was not a factor in the Committee's decision to deny the Class III request. (Docket #45 ¶ 56.)

Plaintiff disputes this characterization. He argues that defendants knew his condition was degenerative (based on x-rays that were taken in March 2012) and therefore worsening over time and causing him pain. (Docket #59 at 7, 14; Docket #1-1 at 28-29.) He states that the pain was so bad that he cried at times and so constant that he had trouble sleeping. (Docket #59 at 7.) He explains that "this activity of walking every step, every day became a challenge to endure the pain from walking." (Docket #59 at 8.) He claims that the Committee knew of his pain because they had access to the many HSRs he filed. (Docket #59 at 7.) Plaintiff also states that, after the Committee denied the

---

complaint to add the Committee members (except for Dr. Charles Larson who was dismissed at screening) as defendants. I will address plaintiff's request later in this decision.

request, his treating physician told him that "the prison is trying to save money on medical expenses." (Docket #1 at 7.) (The treating physician denies making this statement. (Docket #45 at 57.))

The Committee decided to allow plaintiff to obtain his own personal shoes to see if that resolved his pain. (Docket #45 ¶51.) Defendants state that plaintiff "had the capacity to obtain his own shoes." (Docket #45 ¶51.) Although not clear, it appears that defendants mean plaintiff had adequate funds to purchase his own shoes from a selection offered in institution catalogues. (Docket #45 ¶53, 61.)

Plaintiff disputes his "capacity" to obtain his own shoes. Although he does not take issue with the determination that he could afford to buy shoes, he explains that, in order to obtain a pair of shoes that properly fit and addressed his needs, he would have to try on multiple pairs, a process that is not feasible when ordering shoes from a catalogue. (Docket #1 at 7.) He states, "I need a proper fitting . . . or else I'll be in the same boat as before." (Docket #45 ¶¶53, 61.)

## F. Hanson's Complaints After the Denial of the Class III Request

On May 21, 2014, plaintiff filed an inmate complaint complaining that he was being denied proper medical care because he was not permitted to see a podiatrist. (Docket #49-1 at 12.) He stated that he could hardly walk and the pain is great. (Docket #49-1 at 12.) Because the complaint involved an inmate's health care, the complaint was referred to the Bureau of Health Services Coordinator for review and a decision. (Docket #45 ¶84.) DeRosa received the complaint on May 21, 2014, after the inmate complaint examiner (not a defendant) made his recommendation to dismiss the complaint. (Docket #45 ¶87.) On June 6, 2014, DeRosa determined, based on her review of the medical records, that

7

the complaint had been properly dismissed. (Docket #45 ¶86, 87.) DeRosa relied on the evaluations of two different physicians, whose skills (as doctors) were superior to hers (as a nurse), that it was not medically necessary for plaintiff to see a podiatrist and that plaintiff could buy his own shoes for additional comfort. (Docket #45 ¶87.) At no point did Hepp (the Fox Lake Warden) receive or review the inmate complaint. (Docket #45 ¶92.)

On July 7, 2014, plaintiff submitted an HSR demanding to see a podiatrist. (Docket #45 ¶68.) Meier responded on August 14, 2014, pointing out that plaintiff had seen his treating physician that day and there was no change noted in his condition. (Docket #45 ¶ 68.) In addition, Meier explained that she had no authority to send plaintiff to a specialist and his treating physician's request to send him to a specialist had been denied. (Docket #45 ¶ 69.)

On July 10, 2014, plaintiff submitted another HSR asking again to see a podiatrist. (Docket #45 ¶63.) DeRosa reviewed plaintiff's medical records and noted that he had been provided black Velcro shoes and gel inserts. (Docket #45 ¶ 64.) She also noted that no new developments in his condition required a reassessment of the Class III request denial. (Docket #45 ¶64.) DeRosa scheduled plaintiff for a follow-up appointment so his foot pain could be re-evaluated by Health Services staff. (Docket #45 ¶65.)

On August 27, 2014, plaintiff was transferred to Prairie du Chien Correctional Institution. (Docket #45 ¶70.)

## G. Hanson's Toe Surgeries

On May 13, 2015, and September 16, 2015, plaintiff underwent surgery on his right and left big toes, respectively. (Docket #37-1 at 2-5.) The same procedure was performed on both toes: "a Keller bunionectomy with Biopro implant." (Docket #37-1 at 5.) The

8

surgical notes with regard to the operation on the left big toe indicate, "The cartilage was inspected at this time and articular surface of the 1st metatarsal was noted to be with only 10% of cartilagenous volume remaining in tact. As such, the decision was made that appropriate treatment involved placement of a 1st metatarsophalangeal implant device." (Docket #37-1 at 3.)

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed, or is genuinely disputed, must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion

9

must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## B. Deliberate Indifference

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997). This standard contains both an objective element (i.e., that the medical needs be sufficiently serious) and a subjective element (i.e., that the officials act with a sufficiently culpable state of mind). Id.

For purposes of their motion for summary judgment, defendants have conceded that plaintiff suffered from an objectively serious medical condition because he had arthritis in his big toes. As such, my analysis will focus only on the subjective element, i.e., whether defendants were deliberately indifferent to plaintiff's condition.

To establish the subjective element, a plaintiff must show that the defendants had "actual knowledge" that he was "at risk of serious harm." Pittman ex rel. Hamilton v. County of Madison, Ill., 746 F.3d 766, 778 (7th Cir. 2014). Mere disagreement with a medical professional's medical judgment will be insufficient to make this showing. Snipes v. DeTalla, 95 F.3d 586, 591 (7th Cir. 1996). "A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.'" Id. at 592 (quoting Thomas v. Pate, 493 F.2d 151, 158 (7th Cir. 1974)). In other words, "[t]he federal courts will not interfere

10

with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014) (citations omitted).

The Court of Appeals for the Seventh Circuit has specifically noted, however, that the failure to authorize a visit to a specialist may permit an inference of deliberate indifference. Pyles v. Fahim, 771 F.3d 403, 411 (7th Cir. 2014). Specifically, "when the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the 'obdurate refusal' to engage specialists permits an inference that a medical provider was deliberately indifferent the inmate's condition." Id. at 412.

Finally, § 1983 makes public employees liable "for their own misdeeds but not for anyone else's." Burks v. Raemisch, 555 F.3d 592, 596 (7th Cir. 2009). An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged unconstitutional deprivation of rights. Zentmeyer v. Kendall County, 220 F.3d 805, 811 (7th Cir. 2000). A plaintiff cannot maintain an action against a defendant based only on the defendant's supervisory role. T.E. v. Grindle, 599 F.3d 583, 588 (7th Cir. 2010).

**1. Warden Randall Hepp**

Defendant Hepp must be dismissed because he had no personal involvement in the alleged constitutional violations. Plaintiff has not rebutted Hepp's sworn statements that Hepp did not supervise plaintiff's medical care, did not receive or review plaintiff's HSRs, and did not receive plaintiff's inmate complaint. Because Hepp had no notice of the alleged failure to provide plaintiff with medical care, he had no opportunity to intervene in

11

the alleged constitutional violation. Hepp cannot be liable merely because of his supervisory role. I dismiss Hepp as a defendant.

### 2. Health Services Manager Holly Meier

Defendant Meier must be dismissed because she was not deliberately indifferent to plaintiff's serious medical condition. Meier was not tasked with providing medical treatment to plaintiff. Instead, as the Health Services Manager, her duties included providing overall administrative support and providing direction to the Health Services Unit.

The interaction between plaintiff and Meier is limited to plaintiff filing HSRs and Meier responding to those HSRs. In every instance, Meier responded promptly and either directly addressed plaintiff's requests (e.g., when she ordered the right-sized insole) or scheduled an appointment for plaintiff with someone who could address his needs (e.g., when she scheduled multiple appointments with his treating physician or a nurse practitioner).

Further, Meier was not a Committee member and, in fact, was not even actively working at Fox Lake when the Committee denied the request that plaintiff be referred to a podiatrist. Meier was on medical leave when that decision was made, and, upon her return, she was entitled in these circumstances to rely on the decisions of the medical professionals who were charged with treating plaintiff.

Plaintiff has presented no evidence indicating that Meier was deliberately indifferent to his medical needs, and she is dismissed from this lawsuit.

### 3. Bureau of Health Services Nursing Coordinator Jodi DeRosa

Similarly, defendant DeRosa must be dismissed because she was not deliberately indifferent to plaintiff's serious medical condition. As the Bureau of Health Services Nursing Coordinator, DeRosa was responsible to coordinate and oversee health services provided at all Department of Corrections facilities. She did not directly manage the Health Services staff at Fox Lake (or any institution), but rather she served as a consultant and liaison between the institution Health Services and the Bureau of Health Services.

The interaction between plaintiff and DeRosa is limited to her review of the recommended dismissal of plaintiff's inmate complaint, which she received on May 21, 2014, and her response to one of plaintiff's HSRs, which she received on July 10, 2014.

With regard to the inmate complaint, DeRosa states that she affirmed the dismissal after reviewing his medical records because plaintiff's treating physicians did not believe it was medically necessary for plaintiff to see a podiatrist. It was not deliberately indifferent for DeRosa, as a nurse who was not treating plaintiff herself, to rely on the assessment of his treating physicians. See Perez v. Zunker, 180 Fed.Appx. 528, 531(7th Cir. 2008) (unpublished) (holding nursing coordinator not deliberately indifferent for rejecting an inmate's complaint after satisfying herself that treatment was being provided).

With regard to the HSR, DeRosa promptly responded to plaintiff and scheduled a follow-up appointment for plaintiff so he could be re-evaluated by Health Services staff. Plaintiff has presented no evidence indicating that Meier was deliberately indifferent to his medical needs, so I dismiss his claim against her.

13

### 4. Chair of the Bureau of Health Services Class III Utilization Review Committee, Scott Hoftiezer

Whether Hoftiezer was deliberately indifferent to plaintiff's serious medical needs is a closer call. In response to complaints about pain in his big toes, plaintiff's feet were x-rayed in 2012. The x-rays revealed mild degenerative disease, but no fracture, no dislocation, and no soft tissue swelling. In addition, the results noted no osteomyelitis, which is an infection in the bone. See Mayo Clinic website, http://www.mayoclinic.org/diseases-conditions/osteomyelitis/basics/definition/CON-20025518 (last visited Feb. 17, 2016).

Plaintiff continued to complain of pain in his big toes, and his treating physician continued to try different methods of addressing that pain, including providing plaintiff with Velcro shoes, insoles, and cortisone shots. In May 2014, after plaintiff's persistent requests to see a foot specialist and his complaints about the care he was receiving at the institution, plaintiff's treating physician submitted a request to the Committee that plaintiff be referred to a podiatrist. (Docket #45 ¶37.) This is the first time that Hoftiezer became aware of plaintiff's condition.

As part of the treating physician's presentation to the Committee, he presented information about plaintiff's diagnosis, medical history, and proposed treatment. He also answered questions from the Committee. Hoftiezer recalls that plaintiff had bilateral degenerative arthritis in his big toes, which is common and does not automatically require special shoes or special shoe inserts. (Docket #45 ¶ 50.). He also recalls that plaintiff's toes lacked signs or symptoms of inflammation, infection, or other disease processes. (Docket #45 ¶ 49.) The treating physician also noted that plaintiff's "feel" showed minimal

14

to no dysfunction (Hoftiezer does not explain what the treating physician meant by plaintiff's feel) and he was able to carry out the acts of daily living. (Docket #45 ¶ 49.)

The Committee unanimously decided that there was no need for plaintiff to see a podiatrist and that plaintiff should continue the conservative treatment that he was receiving at the institution. Plaintiff's treating physician was one of the Committee members, and he agreed with this decision. The Committee also decided that plaintiff would be permitted to purchase his own shoes from an approved catalogue rather than having to wear the standard state-issued shoe. Hoftiezer states that this option had proven effective for many other patients who had presented with similar complaints of pain in their feet.

Defendants note that plaintiff had the "capacity" to obtain his own shoes. Although it is unclear how much money plaintiff had in his regular account in May 2014, as of October 2015, plaintiff had $92.46 in his regular account, and the majority of the shoes in the approved catalogue cost between $20.00 and $75.00. Plaintiff does not dispute that he could afford to buy his own shoes; he argues only that ordering shoes from a catalogue would not work because he would not be able to try them on before purchasing them to make sure they were a good fit. Plaintiff, of course, is familiar with his shoe size (including that he has an unusually wide foot). He does not indicate whether he would have been prohibited from returning a pair of shoes that ended up being a poor fit, and neither of the parties indicate whether plaintiff ever tried purchasing his own shoes.

Plaintiff also argues that his pain had nothing to do with the shoes he was wearing, but there is evidence in the record that suggests a different shoe might have been effective in treating plaintiff's toe pain. On May 16, 2013, plaintiff submitted an HSR to a non-

15

defendant nurse, in which he stated, "Thank you v[e]ry much for the foot supports! I can not [sic] believe how much of a difference they make on my feet & toes. . . ." (Docket #1-1 at 14.) Thus, in the past, it appears that additional support within plaintiff's state-issued shoe was sufficient to at least temporarily address his pain. Better support in a non-state-issued shoe may have been, as defendants suggest, sufficient to address plaintiff's needs.

Recently, the Court of Appeals for the Seventh Circuit explained, "Doctors may exercise their medical judgment when deciding whether to refer a prisoner for specialist care; a decision not to refer will constitute deliberate indifference only when the decision is 'blatantly inappropriate.'" Davis v. Wahl, 595 Fed. Appx. 488, 490 (7th Cir. 2015) (unpublished) (citing Pyles v. Fahim, 771 F.3d 403, 411-12 (7th Cir. 2014).

In Pyles v. Fahim, a prisoner sued his treating physician, in part, for refusing to refer him to a specialist. 771 F.3d at 404. The prisoner was suffering from extreme pain in his lower back after slipping and falling on some stairs. X-rays revealed mild or minimal degenerative changes but no fracture or other abnormality. The treating physician prescribed various painkillers and instructed the prisoner on stretching exercises. Although the painkillers proved to be ineffective, the prisoner acknowledged that physical activity partly relieved his pain. Nonetheless, he complained that he suffered excruciating pain that worsened over time.

The Court of Appeals first noted that, "Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion." Pyles, 771 F.3d at 411. It then emphasized that, in those cases where a failure to refer a prisoner to a specialist permitted an inference of deliberate indifference, "the need for

16

specialized expertise either was known by the treating physicians or would have been obvious to a lay person . . . ." Id. at 412.

The court in Pyle held that the treating physician's choice not to refer the prisoner to a specialist was not "blatantly inappropriate" because there was no prior indication of a potentially serious long-term medical issue, nor was the need for a specialist obvious. In addition, the court noted that, although the prisoner may have wanted different treatment, his disagreement with his treating physician did not allow him to prevail on his Eighth Amendment claim.

I find Pyle to be instructive. Here, x-rays revealed that plaintiff had mild degenerative joint disease, which Hoftiezer has indicated is not uncommon in people, and apart from plaintiff's subjective complaints of pain, there was no obvious need for a specialist. Plaintiff's treating physician noted that there were no signs of inflammation, infection, or other disease processes, and that plaintiff showed minimal to no dysfunction. In addition, Hoftiezer explained that allowing a patient to transition from state issued boots and/or shoes to a shoe of their choice often proved to be an effective and sufficient way of treating similar complaints of pain. In fact, in the past, allowing plaintiff to use inserts in his state-issued shoes seemed to have worked at least temporarily. Finally, plaintiff's own treating physician, who had tried different options over time, agreed that referring plaintiff to a podiatrist was not necessary at that time.

Accordingly, I find that Hoftiezer exercised his discretion in choosing not to refer plaintiff to a podiatrist at that time and that choice was not blatantly inappropriate. I will dismiss plaintiff's claims against Hoftiezer.

17

### III. Plaintiff's Request to Amend His Complaint

Plaintiff also asks to amend his complaint to include all the Committee members who decided that he should not be referred to a podiatrist. He states that he learned of their names (and presumably their existence) only after defendants filed their motion for summary judgment on January 20, 2016.

Federal Rule of Civil Procedure 15(a) requires that leave to amend "be freely given when justice so requires." The Supreme Court has explained that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." Foman v. Davis, 371 U.S. 178, 182 (1962). However, the Supreme Court also explained that leave need not be given when reasons such as undue delay, undue prejudice to the opposing party, or futility exist. Id.

I will not allow plaintiff to amend his complaint at this late date. Plaintiff was allowed more than six months to conduct discovery (the court twice extend the discovery deadline at plaintiff's request), yet he somehow failed to uncover this very basic fact. This demonstrates a failure to properly investigate his claims, and I will not allow him to essentially restart his lawsuit simply because defendants have now revealed information that plaintiff easily could have discovered on his own. In any event, amending his complaint to include these other Committee members would be futile. I have already decided that the decision by Hoftiezer (and therefore, by extension, the Committee) not to refer plaintiff to a podiatrist did not demonstrate deliberate indifference to plaintiff's medical needs. Thus, claims against the Committee members on this basis would be unsuccessful.

### IV. Plaintiff's Request that the Court Decide Docket # 14 & 16

Plaintiff also requests in his response to defendants' motion that I "consider all the motions filed even the unruled ones . . . such as Doc. #14 & 16 . . ." Docket #14, filed on August 22, 2014, is a certificate of service with various attachments, including copies of HSRs and a letter to his treating physician. No ruling was necessitated by this filing, which contains no motion or request for court action, so no ruling was or will be made.

Docket #16, filed on December 19, 2014, was a "notice" of more defendants to be added to his lawsuit. In that notice, plaintiff purported to name additional defendants. This was an improper attempt to amend the complaint because plaintiff failed to follow the requirements of Civil Local Rule 15. To the extent a ruling on plaintiff's "notice" is required, I deny the plaintiff's request based on his failure to follow the relevant procedural rules.

### **ORDER**

**THEREFORE, IT IS ORDERED** that plaintiff's requests to amend his complaint (Docket #59, 16) are **DENIED**.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment (Docket #43) is **GRANTED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin, this 29th day of February, 2016.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge